UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Scott W. Johnson

      Plaintiff,

vs.

Jan Malcolm in her Official and Individual Capacities; and Michael Schommer in His Official and Individual Capacities,

      Defendants.

Case No. 20-CV-1275 (DWF/BRT)

**Defendants' Memorandum in Support of Their Motion to Dismiss the Plaintiff's Amended Complaint**

During the pendency of the COVID-19 health crisis, the Department of Health has been conducting weekday media updates to provide information about the disease and the State's public health response. The media updates have been simultaneously broadcast by various media entities. The Department uses an associated conference call service to allow certain invited journalists to pose questions to the Commissioner and others during the update. For obvious reasons, the Department limits the number of people who can join the conference line and ask questions – generally restricting the calls to journalists affiliated with media organizations with established news rooms.

The Department is not currently inviting the plaintiff to join the daily conference call. He claims that he is being excluded because he asked "tough questions" on earlier calls. This is not accurate. The plaintiff's questions were routine. He was excluded consistent with the Department's preference to limit the calls to large media organizations with substantial news rooms and reach in order to cope with the unprecedented media attention.

1

For the purposes of this motion to dismiss, however, the Court and the defendants are required to accept as true the plaintiff's allegation that his "tough" questions sent the Department scurrying for cover. Even so, those allegations are insufficient to get his claims past a motion to dismiss. The plaintiff has no First Amendment right to question the Department or its Commissioner, and his claims should be dismissed.

## BACKGROUND

The State is currently in a peacetime emergency to address the health impacts of COVID-19. (Am. Compl. ¶¶ 11-14.) The Department of Health is the State's primary public health agency, and has much of the responsibility for organizing the State's response to the disease. (*Id.* ¶ 15.) Commissioner Malcolm heads the agency. (*Id.* ¶ 9.) Defendant Michael Schommer is a Department employee. (*Id.* ¶ 10.) As part of its public information efforts, the Department has been holding daily weekday media updates since March 27. (*Id.* ¶ 15.) To date, all of the media updates have been simultaneously broadcast to the public at large by various media outlets. (*Id.*)

The Department rents a conference line to allow journalists to ask questions of Commissioner Malcolm and others during the media updates. (*Id.* ¶ 16.) The conference line is not open to the public, and access is limited even for journalists. (*Id.*) Prior to April 27, the plaintiff participated on several calls. (*Id.* ¶¶ 21-22.) He alleges that he had several questions answered by e-mail after the media updates concluded, but did not ask any live questions during the updates. (*Id.* ¶ 23.)

On April 27, the plaintiff asked the Department two questions, one concerning why broad closures were put in place if a majority of deaths were in long-term care

2

facilities, and one concerning whether a person who died in a hospital but resided in a long-term care facility would be reported as a death from a long-term care facility. (*Id.* ¶ 24.) The Department answered both questions. (*Id.* ¶ 26.) In connection with the questions, Department employee Michael Schommer had contact with the Governor's office. (*Id.* ¶ 27.) This included an e-mail from Mr. Schommer in which he stated: "Flagging as an FYI and for future discussion." (*Id.*) The plaintiff speculates that the allegedly tough nature of his questions led the Department to exclude him from subsequent calls. (*Id.* ¶ 29.)

## ARGUMENT

It is important to distinguish what this case is about, and what it is not about. The plaintiff has not been excluded from listening to the media updates in real-time. Every media update has been simultaneously broadcast by one or more media organizations. To the extent the plaintiff needs real-time access to the media updates, he has it. What the plaintiff instead seeks is an *order* from the Court compelling the Commissioner to answer *his* questions. No federal court has ever ordered a public official to take and answer questions from a particular journalist or news commentator, nor held that the First Amendment is implicated by a public official not taking questions from a particular journalist. The plaintiff's unprecedented request for relief has no foundation in the First Amendment, and should be dismissed.

I.   **Applicable Legal Standard.**

A complaint may be dismissed for failure to state a claim upon which relief can be granted under Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set

of facts in support of the claim entitling the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Under *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007), a plaintiff must plead facts sufficient to "raise a right to relief above the speculative level." The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A complaint cannot simply "leave open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." *Id.* at 561 (citation and internal punctuation omitted). Rather, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 570. Following *Twombly*, the U.S. Supreme Court held:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).

If the Court relies on matters outside the pleadings, the motion is converted to a motion for summary judgment. Fed. R. Civ. P. 12(c). However, in ruling on a motion to dismiss, a court may consider materials that are part of the public record or do not contradict the complaint, as well as materials necessarily embraced by the pleadings, without converting the motion to one for summary judgment. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *Stahl v. United States Dep't of Agric.,* 327 F.3d 698, 700 (8th Cir. 2003); *Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 697 n.4 (8th Cir. 2003).

## II. THE PLAINTIFF FAILS TO STATE A CLAIM UNDER THE FIRST AMENDMENT.

There is a large and well developed body of case law consistently holding that the First Amendment does not give journalists a right to question public officials or access government information. *See e.g. The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 415-416 (4th Cir. 2006). Many plaintiffs have tried to plead their way around this well-established body of case law with arguments of First Amendment retaliation, only to find those arguments rejected. *Id.* This Court should follow course, and dismiss the plaintiff's complaint for failure to state a claim.

### A. The Plaintiff Has No First Amendment Right of Access to the Commissioner, or to Question the Commissioner.

Claims by reporters that they have been denied access to question public officials or access government information in violation of the First Amendment are relatively common, and have been consistently rejected by federal courts. *See e.g. Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 942-43 (8th Cir. 2016); *Baltimore Sun*, 437 F.3d 410, 415-416. This is true even where the plaintiff pleads that the denial of access was in retaliation for adverse news coverage – the exact claim made by the plaintiff here. *Id.*

The First Amendment does not guarantee any right of access to public officials or public records. *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), *Eggenberger*, 820 F.3d 938, 942. As the *Eggenberger* court held, the Supreme Court has "never intimated a First Amendment guarantee of a right of access to all sources of information within government control." *Eggenberger*, 820 F.3d 942. Instead, the First Amendment guarantees only a right to publish information, "not necessarily a right

5

to *gain* information." *Id.* (emphasis in original).  Simply put, Supreme Court cases do "not remotely imply a constitutional right guaranteeing anyone access to government information beyond that open to the public generally." *Id.*, *citing Rice v. Kempker,* 374 F.3d 675, 680 (8th Cir. 2004).  As a result, claims brought by reporters alleging First Amendment claims for denial of access to public officials or public records are routinely dismissed.  *Eggenberger*, 820 F.3d 942-43; *Baltimore Sun Co.*, 437 F.3d 410, 415-416.

Recognizing the infirmities of bringing a First Amendment claim for access, many reporters refashion their access claims into First Amendment retaliation claims.  But refusing to answer the questions of a reporter is, as a matter of law, not a sufficiently coercive government action to sustain a claim for First Amendment retaliation.  *Id.* Instead, First Amendment retaliation claims require substantially coercive actions – like a city mayor instructing the police to issue daily parking tickets to a shop owner who made complaints to city hall.  *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003).

*Baltimore Sun* is particularly apposite.  In *Baltimore Sun*, it was undisputed that the defendants (Maryland's governor and press staff) specifically targeted two reporters for retaliation based on the content of their reporting, and instructed Maryland officials to cease contact with them.  *Baltimore Sun*, 437 F.3d at 413.  Indeed, the defendants *published* the ban in an official directive:

> Effective immediately, no one in the Executive Department or Agencies is to speak with [Baltimore Sun reporter] David Nitkin or [Baltimore Sun columnist] Michael Olesker until further notice. Do not return calls or comply with any requests. The Governor's Press Office feels that currently both are failing to objectively report on any issue dealing with the Ehrlich–Steele Administration. Please relay this information to your respective department heads.

*Id.* Among other things, the ban precluded the reporters from attending press briefings otherwise open to reporters, but not to the public. *Id.* at 414.

The Sun sued making the same claim the plaintiff makes here – that limiting reporter access to public officials in response to the content of their reporting violated the First Amendment. *Id.* at 415. The district court dismissed. *Id.* The Fourth Circuit affirmed, holding that the Sun could not make out a First Amendment retaliation claim as a matter of law. *Id.* at 416. The *Baltimore Sun* court supported its decision with two rationales equally applicable here.

First, the court held that denying a reporter access to question state officials was not sufficiently coercive to bring First Amendment scrutiny. *Id.* at 416. The court held that there is a recognized distinction between an adverse impact resulting from government action that "is *actionable*, on the one hand, and a *de minimis* inconvenience, on the other." *Id.* (emphasis in original). Plaintiffs "seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to their exercise of First Amendment rights." *Id.* (citations omitted). The court held that a public official's refusal to engage with a reporter is a non-actionable inconvenience as a matter of law because the "adverse impact of such conduct is objectively *de minimis.*" *Id.* at 419. "It would be inconsistent with the journalist's accepted role in the 'rough and tumble' political arena to accept that a reporter of ordinary firmness can be chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting." *Id.*, *see also Eggenberger*, 820 F.3d at 943; *Velie v. Hill*, 736 F. App'x 165, 166 (9th Cir. 2018); *Davidian v. O'Mara*, 2000 WL

7

377342 * 4 (6th Cir. 2000); *Snyder v. Ringgold*, 1998 WL 13528 * 3-4 (4th Cir. 1998); *In Raycom Nat., Inc. v. Campbell*, 361 F. Supp. 2d 679 (N.D. Ohio 2004).

Second, the court held that the Supreme Court "has condoned limiting retaliation liability when the challenged government action, whether conduct or speech, is so pervasive, mundane, and universal in government operations that allowing a plaintiff to proceed on his retaliation claim would 'plant the seed of a constitutional case' in 'virtually every' interchange." *Baltimore Sun*, 437 F.3d at 416 *citing Connick v. Myers*, 461 U.S. 138, 149 (1983). This principle is particularly applicable to the interactions between press and public officials. If every reporter who got the cold shoulder from a public official after writing an unfavorable article could bring a First Amendment retaliation claim, the seeds of a constitutional case would arise from every press interaction. *Id.* at 418. Simply put, having access to "less information than other reporters on account of one's reporting is [a] commonplace", pervasive state of affairs not subject to First Amendment redress. *Id*.

This Court should follow the long string of federal cases barring the claim pled by the plaintiff, and dismiss his complaint.

### B. Press Conferences Are Not Limited Public Forums Requiring the Government to Permit Any Person to Speak.

The plaintiff pleads that Commissioner Malcolm's press conferences are a "limited public forum" and that Commissioner Malcom therefore violated the First Amendment by not allowing the plaintiff to participate in the press conferences. This argument fails as a matter of law for several reasons.

First, the plaintiff has not been excluded from listening to the press conferences. As the plaintiff pleads, various media outlets simultaneously broadcast them to the public at large. (Am. Compl. ¶ 15.)[1] As a result, the plaintiff has the same real-time access to the media updates that any other member of the public or press possesses. There is no meaningful distinction between the plaintiff being allowed to listen to the media updates on a phone line and being allowed to listen or view them on the internet. If anything, the internet feed provides a better perspective because it often includes video. The real gravamen of the plaintiff's complaint is not that he has been excluded from calling into the media updates to listen, it is that he has been excluded from asking question using the conference line. But as set forth above, there is no First Amendment right of a reporter or anyone else to have their questions answered by government officials. *Eggenberger*, 820 F.3d 942; *Baltimore Sun Co.*, 437 F.3d at 415-16; *see also Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 286 (1984). As a result, the plaintiff has not been

---

[1] At one point, the Department also operated a listen-only phone line for the conference calls until it became apparent that the media updates were always being simultaneously broadcast by media outlets, making the listen-only line redundant (and because it is rented, an unnecessary expense).

9

deprived of any constitutional right by being forced to listen to the media updates through simultaneous broadcasts instead of by phone.

Second, the press conferences are not public forums for public speech, they are government forums for government speech – and thus do not bring a First Amendment right of participation. The purpose of the media updates is not to give reporters a forum to express *their* views on COVID-19 issues. The purpose is to give reporters an opportunity to solicit the *Department's* views on COVID-19 issues. Because the media updates are a forum for government speech, content neutrality and the First Amendment are not relevant considerations. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015). As the *Walker* Court held:

> When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas. Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate.
>
> Were the Free Speech Clause interpreted otherwise, government would not work. How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary? How could a state government effectively develop programs designed to encourage and provide vaccinations, if officials also had to voice the perspective of those who oppose this type of immunization? "[I]t is not easy to imagine how government could function if it lacked th[e] freedom" to select the messages it wishes to convey.

*Id.* at 576 U.S. 200, \_\_, 135 S. Ct. 2239, 2245–46 (citations omitted).  Here, the plaintiff argues he has a right to control the course of the media updates by directing the Commissioner to answer his questions.  Indeed, his prayer for relief and pending preliminary injunction motion request an order from this Court *requiring* Commissioner Malcolm to answer *his* questions.  The First Amendment affords no such control over government speech or press conferences to a reporter.  *Id.*  The plaintiff's complaint should therefore be dismissed.

### III.  THE PLAINTIFF'S INDIVIDUAL CAPACITY CLAIMS SHOULD BE DISMISSED.

Even if the Court allows the plaintiff's claims for injunctive relief to proceed, it should dismiss the plaintiff's individual capacity claims for damages.  With respect to Commissioner Malcolm, the plaintiff failed to plead any basis for an individual capacity claim and it should be dismissed.  In addition, both Commissioner Malcolm and Michael Schommer are entitled to qualified immunity from any damages claim.

#### A.  The Plaintiff Has Not Pled a Viable Individual Capacity Claim Against Commissioner Malcolm.

The plaintiff failed to plead allegations against Commissioner Malcolm sufficient to support his individual capacity claim against her, instead resorting to the exact type of "formulaic" recitation of the elements of a claim that is prohibited by *Twombly/Iqbal*.  His individual capacity claim against Commissioner Malcolm should therefore be dismissed.

In his original complaint, the plaintiff referenced Commissioner Malcolm in only two paragraphs, and there pled only that she was the Commissioner and should

reasonably have known that excluding the plaintiff from the conference line would violate his First Amendment rights.  (Compl. ¶¶ 9, 50.)  After a meet and confer in which the Commissioner pointed out the clearly deficient pleading of an individual capacity claim against her, the plaintiff attempted to rectify his pleading with an amended complaint that does nothing to correct its fatal flaws.  With respect to Commissioner Malcolm, the plaintiff merely added formulaic allegations that Department employee Michael Schommer acted "under the direction and supervision of Ms. Malcolm" at various points, and a speculative assertion that "to the extent a policy" exists that would exclude the plaintiff from the conference line, the Commissioner designed it with the purpose of excluding him.  (*Id.* ¶¶ 28-30, 47-48.)

It was be difficult to conceive of a more deficiently attempted amendment of an already deficient claim.  What the plaintiff has attempted to do is *exactly* what the Supreme Court sought to bar with its *Twombly/Iqbal* decisions – *Iqbal* in particular.  Like the present case, *Iqbal* was a Section 1983 case in which the plaintiff sued (among others) the U.S. Attorney General and the FBI Director alleging they were liable because they supervised the allegedly offending federal employees, and were the "principal architects" of policies the plaintiff challenged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  The Supreme Court found that these pleadings were insufficient to survive a motion to dismiss, holding that "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Here, the plaintiff has pled nothing against Commissioner Malcolm beyond mere conclusory statements that she

supervises the Department.[2] The plaintiff's individual capacity claim against Commissioner Malcolm must therefore be dismissed.

### B. Commissioner Malcolm and Michael Schommer Are Entitled to Qualified Immunity.

Qualified immunity shields state officials from liability for damages for actions taken under color of law unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

As set forth above, the federal courts have consistently rejected First Amendment retaliation claims by reporters who allege that government officials denied them access to government officials or information. This includes cases in the Eighth Circuit and the District of Minnesota. *See Eggenberger v. W. Albany Twp.*, 90 F. Supp. 3d 860 (D. Minn. 2015), *aff'd*, 820 F.3d 938 (8th Cir. 2016). As a result, even if this Court were to conclude that the defendants wrongfully excluded the plaintiff from the conference line associated with the media update, that conclusion would not reflect clearly established law known to either defendant. The plaintiff's individual capacity damages claims should therefore be dismissed on the basis of qualified immunity.

---

[2] Notably, the dismissed allegations in *Iqbal* were more detailed than anything pled by the plaintiff here. *See Iqbal*, 556 U.S. at 680–81.

## CONCLUSION

For the reasons set forth above, the Court should dismiss all defendants and all claims, with prejudice.

Dated: June 9, 2020                     Respectfully submitted,

                                        KEITH ELLISON
                                        Attorney General
                                        State of Minnesota


                                        /s/ Oliver J. Larson
                                        OLIVER J. LARSON
                                        Assistant Attorney General
                                        Attorney Reg. No. 0392946

                                        445 Minnesota Street, Suite 1400
                                        St. Paul, Minnesota 55101-2131
                                        (651) 757-1265 (Voice)
                                        (651) 297-1235 (Fax)
                                        oliver.larson@ag.state.mn.us

                                        ATTORNEY FOR DEFENDANTS