UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Scott W. Johnson,                                    Civil No. 20-1275 (DWF/BRT)

        Plaintiff,

v.
                                                                                             **MEMORANDUM OPINION**

Jan Malcolm and Michael Schommer, in                    **AND ORDER**
their official and individual capacities,

        Defendants.
_____

Ian Andrew Blodger, Esq. and Theresa M. Bevilacqua, Esq., Dorsey and Whitney LLP, counsel for Plaintiff.

Oliver J. Larson, Assistant Attorney General for the State of Minnesota, counsel for Defendants.
_____

## INTRODUCTION

Plaintiff Scott W. Johnson ("Plaintiff" or "Johnson") alleges a First Amendment cause of action, pursuant to 42 U.S.C. § 1983, against Defendants Jan Malcolm ("Malcolm" or the "Commissioner") in her official and individual capacities as Commissioner of the Minnesota Department of Health and Michael Schommer ("Schommer") in his official and individual capacities as an employee of the Minnesota Department of Health (together, the "Defendants"). Plaintiff seeks declaratory and injunctive relief. Specifically, Plaintiff seeks an order compelling Defendants to restore his access to the journalist conference line for the Minnesota Department of Health's daily briefings on COVID-19 (the "MDH Conference Line"). This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. No. 9) and Defendants'

Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 18.)  For the reasons discussed below, the Court denies both motions.

## BACKGROUND

Malcolm is the Commissioner of the Minnesota Department of Health (the "Department" or the "MDH").  As Commissioner, Malcolm directs the Department and supervises its daily COVID-19 briefing.  (Doc No. 14 ("Am. Compl.") ¶ 9.)  Schommer serves as the Communications Director of the Department.  (*Id.* ¶ 10; Doc. No. 28 ("Schommer Decl.") ¶ 1.)  Schommer oversees the Department's Communications Office and its media relations.  (Am. Compl. ¶ 10; Schommer Decl. ¶ 3.)  The Communications Office disseminates important public health information to the press, including information related to the COVID-19 outbreak.  (Schommer Decl. ¶ 3.)

On March 13, 2020, Minnesota Governor Tim Walz issued Executive Order 20-01, "Declaring a Peacetime Emergency and Coordinating Minnesota's Strategy to Protect Minnesotans from COVID-19."  (Am. Compl. ¶ 11.)  Governor Walz explained that the MDH would lead the coordination of the State's response to COVID-19.  (*Id.* ¶ 13.)  On March 25, 2020, the Governor issued Executive Order 20-20 mandating that "all persons currently living within the State of Minnesota . . . stay at home or in their place of residence" except to engage in certain activities and work (the "Stay at Home Order").  (*Id.* ¶ 14.)  On March 27, 2020, the MDH began hosting a daily briefing regarding the COVID-19 outbreak and Minnesota's response to the pandemic.  (*Id.* ¶ 15.)  The briefings are streamed live via the publicly accessible MDH website and televised and broadcast to the public at large.  (*Id.*)

Traditionally, the MDH's Communications Office holds occasional media briefings to communicate to multiple reporters simultaneously on an "as-needed" basis. (Schommer Decl. ¶ 4.) The briefings can take the form of news conferences hosted in person, or sometimes in the form of media-only telephone calls with reporters. (*Id.*) The Communications Office maintains several distribution lists for news releases and other public notifications. (*Id.* ¶ 5.) The large distribution list includes reporters who work for media outlets in Minnesota, as well as other stakeholders, such as the Centers for Disease Control, and staff of other organizations or agencies. (*Id.*) The small list (the "Small List") focuses on reporters from professional media outlets and certain staff members in the MDH and Governor Walz's administration. (*Id.*) For media participants on the Small List, the Department evaluates whether members of the media are employed by a professional media outlet affiliated with broadcast, print, or web-based publication, whether they provide daily or regularly scheduled content, whether they have an editorial review process, and whether they have multiple staff and a newsroom. (*Id.*)

Before the COVID-19 pandemic, there was limited interest in being included in the Small List or participating in media briefings, which rarely occurred more than once a month. (*Id.* ¶¶ 5, 6.) Beginning in late February 2020, increased information requests from the public and media on COVID-19 issues led the Department to schedule daily weekday media briefing calls (the MDH Conference Line calls). (*Id.* ¶ 8.) Eventually, the Communications Office created an even smaller distribution list for the MDH Conference Line. (*Id.* ¶ 10.) This smaller list is referred to as the "RSVP" list. (*Id.*)

3

Before creation of the RSVP list, a journalist wanting access to the MDH Conference Line was required to request access from the MDH. (Am. Compl. ¶ 16.) Defendants contend that the difference between the Small List and the RSVP list is the MDH's criteria for inclusion, and that the criteria for the RSVP list was implemented on April 27, 2020. (Schommer Decl. ¶ 20.) The MDH Conference Line is not open to the public. Once added to the Small or RSVP list, a participant does not need to continue sending requests for access to the Commissioner's teleconference briefings. (*Id*.) The MDH Conference Line provides a forum for reporters to ask questions of those public officials presenting at the MDH daily briefing. (Am. Compl. ¶¶ 18-19; Johnson Decl. ¶ 11.) To ask questions, reporters on the MDH Conference Line enter a telephone queue. (Am. Compl. ¶ 18.) Journalists who ask questions live have their questions and the MDH's panelists' responses broadcast live. (*Id*.) Reporters not called on can submit written questions. (*Id*. ¶ 19.)

Johnson is a retired attorney. (Am. Compl. ¶¶ 7-8; Doc. 12 ("Johnson Decl.") ¶ 1.) Johnson is also a journalist who reports and comments on the news from a conservative perspective. (Johnson Decl. ¶¶ 1-4.) Johnson has published articles in *National Review*, the *Weekly Standard*, the *New York Times*, the *New York Post*, the Minneapolis's *Star Tribune*, and the *St. Paul Pioneer Press*. (*Id*. ¶ 2; Am. Compl. ¶ 7.) In 2002, Johnson and his former law partner John Hinderaker established the *Power Line* website (powerlineblog.com), for which Johnson has written for nearly every day since its inception. (Johnson Decl. ¶ 3.)

On April 9, 2020, Johnson requested access to the MDH Conference Line via an email to the Department. (Am. Compl. ¶ 20; Johnson Decl. ¶ 13, Ex. B; Schommer Decl. ¶ 16.) On April 10, 2020, Schommer replied to Johnson's request and added him to the Small List – granting him access to the MDH daily briefings. (Am. Compl. ¶ 21; Johnson Decl. ¶ 13, Ex. C; Schommer Dec. ¶¶ 16-17.) Thereafter, Johnson generally received emails providing access to the conference line and representatives from the Department responded to his email follow-up questions from April 11, 2020 until April 27, 2020. (Am. Compl. ¶ 22, Schommer Decl. ¶¶ 16-18; Johnson Decl. ¶¶ 14, 25, Exs. D, E, and M.)

On April 17, 2020, Johnson posted an article titled "CORONAVIRUS IN ONE STATE," under the link "CORNAVIRUS" and "MINNESOTA" on *Power Line.* (Johnson Decl. ¶ 14, Ex. E.) In the article, Johnson published the Department's verbatim response to Johnson's questions during the MDH Conference Line briefing in which he participated. (*Id.*) Johnson's questions and answers read:

> [Question:] MDH data show that the median age of COVID-19 decedents is 87, over two-thirds in nursing homes or assisted care facilities. Does the state need to be shut down to protect them?
>
> [Answer:] The stay-at-home order and other measures are having their intended effect by limiting the number of deaths occurring in the wider population, as is happening in New York, New Jersey, Louisiana and elsewhere. As much as we would like to protect everyone and prevent deaths in even our most vulnerable populations, the tragic truth about outbreaks is that the frail and very old or those with compromised immune systems are almost always the ones to feel the effects first and hardest. But if we relax the precautions without having the right safeguards in place, we could see even more deaths amount this population and other at-risk groups.

> [Question:] You referred [in your remarks] to the preparation of the health care system [that is the rationale for] the current shutdown regime [sic]. [Later in your remarks you] noted that flu has disappeared under the current regimen. On the other hand, the hospital systems are laying off and furloughing employees. We only have 213 hospitalized with the virus as of today, with a little over 100 in ICU. It appears that the health care system is vastly underutilized at present that is has significant excess capacity. Is there any question about this? What am I missing?
>
> [Answer:] The preparations that our hospitals have made, as painful as they are right now, have positioned us well to handle the expected surge. The time to prepare for a flood is before the waters rise.

(*Id.*) At this time, Johnson was on the Department's Small List. After a daily briefing on April 27, 2020, Johnson emailed the Department with two follow-up questions. (Am. Compl. ¶ 24.) He received answers to both. (*Id.*)[1]

---

[1] The questions and answers read:

> Gentlemen: I did have a question and a follow-up for Commissioner Malcolm based on today's briefing. I waited in line without being called on again.
>
> Question: Referring to the 286 total deaths to date, every decedent under age 70 has died in long-term care or similar setting. The youngest person to die outside long-term care was in his 70s. Why is it necessary to close the schools and shut down the state to protect the at-risk population?
>
> Follow-up: How many decedents were moved from nursing home to hospitals prior to their death? Would their death be included in the long-term care number [or] not?
>
> [MDH Response:] We have had deaths in people younger than 70 and certainly many cases in all age groups. It is necessary to take all the community mitigation measures we have because <u>all</u> Minnesotans are at risk from COVID 19, as none of us has immunity. Some people, like those in long-term-care and those with underlying health conditions, are far more at risk than others. But if we didn't reduce transmission in the community as we have with the stay at home order, we would see far more disease circulating and many times more serious cases that would quickly overwhelm our health care system. Then, even less-vulnerable people

On the same day, Schommer forwarded Johnson's questions to members of Governor Walz's office, stating "Flagging as an FYI and for future discussion." (Am. Compl. ¶ 27; Johnson Decl. ¶ 25, Ex. M.) On April 28, 2020, Schommer, allegedly under the direction and supervision of Malcolm, chose not to provide Johnson with access to the MDH Conference Line. (Am. Compl. ¶ 30.) No representative from the MDH asked Johnson about the location of *Power Line* or how widely it was distributed. (*Id.*) Johnson sent multiple emails and left voicemails asking why he was no longer provided access to the daily teleconference and allowed to ask questions. (Am. Compl. ¶¶ 31-35; Johnson Decl. ¶¶ 18-22, Exs. G, H, I, J.) Neither Schommer nor anyone else from the Department responded to Johnson's calls and emails. (Am. Compl. ¶ 36; Johnson Decl. ¶¶ 18-23.)

On May 4, 2020, Johnson sent Defendants a Data Practices Act request seeking all documents relating to his request to participate in the daily briefings. (Johnson Decl. ¶ 25, Ex. L.) It was through this request that Johnson learned that Schommer had flagged

---

would not be able to get the care they needed, such as intensive care, ventilators, etc., so we would see far more deaths in people outside of the very frail and elderly. That is what has happened in places like Italy and New York.

[Response to follow-up:] Just as are cases, deaths are recorded by place of residence. So if someone's place of residence prior to their death was listed as a long-term care facility, regardless of whether they were hospitalized prior to their death, they would be recorded as a death in a long-term-care resident [sic].

(Am. Compl. ¶¶ 24-26; Johnson Decl. ¶¶ 15-17, Ex. F.)

7

and forwarded his April 27 questions. On May 19, 2020, reporter Collin Anderson of the *Washington Free Beacon*, a conservative political journalism website, emailed Schommer and another Department employee, asking how media participants for the State's daily press briefings are selected and why the Department had ceased communications with Johnson. (Johnson Decl. ¶ 26, Ex. N.) Schommer responded as follows:

> Thanks for your question. We routinely have so many journalists on the daily briefing call that we cannot field questions from all of them each day. To ensure that the journalists have a reasonable opportunity to get a question in we need to limit call participation only to professional journalists. This approach conforms to the approach taken by other agencies within state and federal government.
>
> While our media relations team tries to respond to other inquiries when time allows, they have been fielding an unprecedented number of media calls during the pandemic. There are several other alternatives available, including our public hotline. That hotline number is XXX-XXX-XXXX.

(*Id.*)

Johnson claims that Defendants terminated his access to the MDH Conference Line due to the content and viewpoint of his questions and/or his related commentary on *Power Line*. Defendants dispute this. Defendants maintain that Johnson has not been excluded from listening to media updates in real-time, as they are simultaneously broadcast by one or more media organizations. Instead, Defendants claim that Johnson seeks an order requiring the Commissioner to answer Johnson's questions. More broadly, Defendants dispute that they did not target Johnson for exclusion based on the content of his questions. Defendants claim that Plaintiff's questions were "unremarkable," that the Department has received similar questions, and that his

8

questions were typical of questions during the COVID-19 briefings. According to Defendants, Johnson was excluded because the Department wanted to prioritize questions from large media organizations with established newsrooms, who were better positioned to widely distribute information about the MDH's pandemic response.

Schommer claims that he forwarded Johnson's April 27, 2020 email to press officials in the executive branch to discuss how they handled telephone media updates when there was substantial participation interest. (Schommer Decl. ¶ 19.) Schommer also claims that he sought advice regarding non-traditional media outlets, such as blogs and individuals like Johnson and *Power Line* – who did not meet the MDH's normal criteria for inclusion in media briefing calls. (*Id.*) According to Schommer, after consulting his colleagues, he decided to limit access to the teleconference briefing to reporters from major media organizations who meet the Department's long-standing criteria for inclusion on the Small List. (*Id.* ¶ 20.) Schommer suggests that it is merely coincidental that the Communications Office began implementing this RSVP List, at his direction, on April 27. (*Id.* ¶¶ 20-23.) Schommer further contends that Johnson's *Power Line* blog does not meet the "long-standing" criteria for inclusion on the Small List because it is not employed by a media organization with substantial staff and local reach and it focused on opinion and news commentary, rather than mere reporting of information. (*Id.* ¶19.) Schommer emphasizes that the MDH depends on press coverage from large media organizations to help disseminate important information about COVID-19 to Minnesotan constituents. (*Id.*)

Johnson filed the original complaint on May 28, 2020.  (Doc. No. 1.)  Johnson filed a Motion for Preliminary Injunction on June 4, 2020.  (Doc. No. 9.)  Johnson seeks an order mandating that Defendants provide him access to the MDH Conference Line and that Defendants grant him the ability to ask questions of the public officials present at the briefings.[2]  On June 8, 2020, Johnson filed an amended complaint adding Schommer as a party and removing the Minnesota Department of Health.  (Am. Compl.)  Defendants filed an opposition to Johnson's motion for a preliminary injunction and separately filed a motion to dismiss for failure to state a claim upon which relief can be granted.  (Doc. No. 18.)

## DISCUSSION

**I.     Motion to Dismiss**

The Court first considers Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged,

---

[2] Plaintiff clarified at the hearing on this matter that he does not seek an order compelling Defendants to allow him to ask a question or to answer any questions. Instead, he seeks an opportunity to ask questions, just like other reporters on the MDH Conference Line.

*Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint.  *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  *Id*. at 555.  As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  *Twombly*, 550 U.S. at 556.

Defendants argue that Johnson's claim fails because he has no First Amendment right to access to the Commissioner or to ask questions to the Commissioner.  Defendants assert that federal courts have consistently rejected First Amendment claims by reporters based on denied access to question public officials or to access government information.  *See, e.g., Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 942-43 (8th Cir. 2016) (explaining that "the First Amendment guarantees a right to publish information, but not necessarily a right to *gain* information;" holding that plaintiff has no First Amendment right to access information which is not publicly available as a general matter); *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 415-16 (4th Cir. 2006) ("Having access to

11

relatively less information than other reporters on account of one's reporting is so commonplace that to allow The Sun to proceed on its retaliation claim addressing that condition would 'plant the seed of a constitutional case' in 'virtually every' interchange between public official and press."). Defendants further argue that Johnson was excluded from the MDH Conference Line based on the Department's preference to limit the calls to large media organizations, but under this line of cases, denial of access does not support a First Amendment claim even if the denial was retaliatory. Specifically, Defendants assert that because a journalist does not have a right to unfettered access, a government official may bar a journalist from attending and asking questions during a press conference.

Importantly, however, the parties dispute the overall scope of the allegations in the Amended Complaint, and Plaintiff maintains that the above line of cases, which involve issues related to general access to a public record or public official, is inapposite because this case involves a "limited public forum." Plaintiff asserts that the allegations in the Amended Complaint relate to the MDH's creation of a limited public forum expressly for the purpose of allowing the press to cover MDH COVID-19 briefings. Under that scenario, Plaintiff argues that he cannot be denied access to the MDH Conference Line due to his viewpoint or for an arbitrary reason.

Plaintiff cites to cases holding that once a government agency grants public access to a limited public forum, it may not revoke the access for arbitrary reasons. "[A] limited public forum is a subset of the designated public forum [that] arises where the government opens a non-public forum but limits the expressive activity to certain kinds

12

of speakers or to the discussion of certain subjects." *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006). In *Bowman*, the Eighth Circuit Court of Appeals defined a limited public forum and explained that in such a forum, restrictions on speech not within the type of expression allowed in the forum must be reasonable and viewpoint neutral. *Id*. at 976.

Here, Plaintiff alleges that the Department established the MDH Conference Line and designated it as the sole means by which journalists could ask questions of government officials. As alleged, the MDH conducts daily public meetings and specifically authorizes journalists to access the MDH Conference Line, through which Malcolm and other officials call on journalists to ask questions. (Am. Compl. ¶¶ 16-19.) For purposes of considering Defendant's motion to dismiss, the Court accepts Plaintiff's allegations as true and construes all reasonable inferences in Plaintiff's favor. Using this standard, and at this early stage of litigation, the Court finds that Plaintiff has alleged that Defendants created a limited public forum.[3]

In addition, Plaintiff alleges that Defendants initially granted Johnson access to the MDH Conference Line and then revoked access based on Johnson's viewpoint. In particular, Plaintiff alleges that after having access to the MDH Conference line for three

---

[3]     Defendants claim that the MDH Conference Line is a forum for government speech and, as such, does not bring a First Amendment right of participation. However, the Amended Complaint does not include allegations regarding the purpose of the MDH Conference Line, other than it allowed journalists to ask questions. Because the Court accepts Plaintiff's allegations as true at this stage of the litigation, Defendants' argument that the MDH Conference Line is a forum for government speech is better addressed at the summary judgment stage.

weeks, Plaintiff posed two questions on April 27, 2020, which were "flagged" by MDH. (Am. Compl. ¶¶ 19-24, 27-29.) Plaintiff was excluded from the MDH Conference Line thereafter. (*Id*. ¶¶ 30, 36.) Plaintiff further alleges, on information and belief, that his questions were flagged "to discuss the means by which [the Department and Department officials] could avoid such questions in the future and what steps they could take to punish Mr. Johnson for asking question[s] that exposed possible flaws in strategy MDH employed in responding to the COVID-19 crisis." (*Id*. ¶ 29.) Construing all reasonable inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged that Defendants revoked Johnson's access based on his viewpoint or the content of his questions. At this stage, those allegations are sufficient to plead a violation of the First Amendment. *See, e.g., Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (explaining that where the White House voluntarily decided to open facilities to the press generally, access cannot "be denied arbitrarily or for less than compelling reasons"); *United Teachers of Dade v. Stierheim*, 213 F. Supp.2d 1368, 1373 (S.D. Fla. 2002) ("The exclusion of Plaintiffs from the press room reserved for members of the 'general-circulation media' constitutes denial of access to information even if the Plaintiffs are allowed entry into the auditorium or given access to another media room."). Accordingly, the Court denies Defendants' motion to dismiss.[4]

---

[4] The Court also declines to dismiss Plaintiff's individual capacity claims at this stage of the litigation.

## II.     Motion for Preliminary Injunction

In considering whether to grant a preliminary injunction, the Court considers four factors:  (1) the threat of irreparable harm to the moving party; (2) the balance between this harm and the injury that granting the injunction would inflict on the non-moving party; (3) the moving party's likelihood of success on the merits; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Id*.  A preliminary injunction is an "extraordinary remedy," and the moving party bears the burden of establishing the need for a preliminary injunction.  *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).

Having found that Plaintiff's claim survives Defendants' motion to dismiss, the Court notes that the question of whether Plaintiff is entitled to a preliminary injunction requires more scrutiny.  As noted above, Plaintiff bears the burden of establishing the need for a preliminary injunction.  The Court first considers whether Johnson is likely to suffer irreparable harm if the Court denies the motion for a preliminary injunction.  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009).  Speculative injury is insufficient to justify a preliminary injunction.  *Novus Franchising, Inc. v. Dawson,* 725 F.3d 885, 894-95 (8th Cir. 2013); *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 603 (8th Cir. 1999).

Here, Plaintiff argues he will suffer irreparable harm unless Defendants provide him access to the MDH Conference Line and allow him the opportunity to ask questions. Plaintiff argues that he will suffer irreparable harm if Defendants continue to exclude him from the MDH Conference Line because he will not have an opportunity to ask questions and will not receive answers.  Defendants argue that Plaintiff cannot demonstrate any cognizable harm, let alone irreparable harm.  Defendants point out that the Commissioner's COVID-19 media updates are broadcast live by several media organizations.  (Johnson Decl. ¶ 7.)  Thus, Plaintiff has the same real-time access to the media updates that is available to all members of the press.  Defendants also point out that they provided a "listen-only" line for journalists and others who wanted real time access to the updates until it became clear that the updates would be simultaneously broadcast, making the "listen-only" line redundant.  (Schommer Aff. ¶ 14.)  In addition, the parties do not dispute that the Commissioner is under no obligation to take or answer any questions during the updates.  Importantly, Defendants underscore that there is no evidence that Plaintiff's reporting has been chilled by his exclusion to the MDH Conference Line.  Based on these facts, the Court concludes that Plaintiff has not shown that he is likely to suffer irreparable harm absent an injunction.  For this reason alone, the Court denies the motion.  *See Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 420 (8th Cir. 1987) (explaining that the moving party's failure to show irreparable harm absent an injunction is sufficient to warrant denial of a request for preliminary injunctive relief).

## CONCLUSION

The Court notes that this is a close call and there is no caselaw directly on point. Considering the unique situation presented by the MHD's response to COVID-19 and the uncertain nature of litigation, the Court believes it would be in the best interest of all parties to avoid an ongoing dispute and, instead, find a solution. It seems that the whole matter could be resolved if the Department simply provided Plaintiff access to the MDH Conference Line, particularly considering the fact that all parties agree the Department is under no obligation to allow Plaintiff to ask questions or to answer any submitted questions.

## ORDER

Based on the foregoing, and all of the pleadings, files, and records herein, the Court, being fully advised in this matter, **IT IS HERBY ORDERED** that:

1. Defendant's Motion to Dismiss (Doc. No. [18]) is **DENIED**.

2. Plaintiff's Motion for a Preliminary Injunction (Doc. No. [9]) is **DENIED**.

Dated:  June 26, 2020                                          s/Donovan W. Frank
                                                               DONOVAN W. FRANK
                                                               United States District Judge